# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AUDREY SANKO | : |
| Plaintiff, | : |
| v. | : 3:16-CV-1620 |
| | : (JUDGE MARIANI) |
| ALLSTATE INSURANCE COMPANY | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

This is a homeowner's insurance action arising from Defendant Allstate Insurance Company's refusal to pay for property damages sustained in Plaintiff's home. Plaintiff alleges that she bought an insurance policy from Allstate on her home for "property damages to the dwelling including physical injury or destruction of tangible property." Doc. 1-1 ¶ 11. The Complaint includes two causes of action against Defendant: breach of contract due to Defendant's denial of coverage and bad faith on the part of Defendant in its evaluation of the claim.

Defendant removed this case to federal court on diversity grounds. Doc. 1. It then filed a motion for summary judgment on October 10, 2016. Doc. 6. On November 1, 2017, Defendant filed a "supplemental motion for summary judgment," which superseded its

1

previous motion for summary judgment. Docs. 33, 42. For the reasons that follow, Defendant's supplemental motion for summary judgment will be granted.[1]

## II. STATEMENT OF UNDISPUTED FACTS

Defendant's Supplemental Motion for Summary Judgment did not include a separate Statement of Material Facts pursuant to Local Rule 56.1. However, the motion contained 145 paragraphs of factual assertions and legal arguments. Doc. 33. Plaintiff has submitted "Answers to [the] Supplemental Motion for Summary Judgment Filed by Defendant" responding to each of the paragraphs. Doc. 35. The Court therefore construes the factual assertions in Defendant's Motion as a Statement of Material Facts, and Plaintiff's "Answers to the Supplemental Motion" as Plaintiff's Answer to the Statement of Material Facts. The following facts are not reasonably in dispute except as noted.

Plaintiff alleges that on or about December 27, 2015, her "home was involved in in an incident that resulted in significant loss of property, personal property damage, damage to her property, loss of use and repair costs, all of which are believed covered under the aforementioned policy" and that Allstate "failed or refused to pay for [Plaintiff's] coverage and losses." Doc. 1-1 ¶¶ 12, 15. The Complaint also alleges that "[c]ontrary to [Defendant's] claims, [Plaintiff's] damages were not caused by a back up of water or sewer through her drains nor was there an overflow of any sump pump." Id. ¶ 18. However, the

---

[1] On January 12, 2018, Defendant requested oral argument on this motion. Doc. 39. Because the issues presented here are straightforward and have been fully briefed by both parties, Defendant's request for oral argument will be denied.

2

Complaint does not specify what the actual cause of Plaintiff's damages was. In its motion, Defendant claims that Plaintiff's loss resulted from "sewage water on the floor of the basement of her secondary residence at 109 S. Shore Drive, Sunrise Lake, Milford, PA." Doc. 33 ¶ 7. Defendant further claims that Plaintiff's individually owned sewage system is "attached to a second, communally-shared underground system of pipes and tanks," such that Plaintiff's sewage waste passes through her individual system and into the community system. *Id.* ¶¶ 8-9. While Plaintiff "denies" these assertions in her Answer to the Statement of Facts, she confirms that she "went into the basement steps and stepped into 8 to 10 inches of smelling water" and that her "home is connected to community sewer system, which has holding beds[,] one of which is across the street from [her] home." Doc. 35 ¶¶ 7, 8. Both Defendant and Plaintiff cite to the same expert reports in support of these assertions.

According to these expert reports, the sewage overflow into Plaintiff's home was due to the fact that "there were significant deficiencies within the community sewage system." Doc. 35-3 (November 13, 2017 Oram Report) at 1. Because "the community sewage system 'shut down'; closed, 'valve turned' or [was] otherwise not operational, [it] caused pressure to build up in the community collection system." *Id.* at 2. According to the reports:

> The pressure built-up within the sewerage collection system for Section 9 [of the community system] and the sudden release of this pressure is the explosion that caused the 'Fernco' coupling to be blown-off the sewer piping for 109 S. Shore Drive [i.e. Plaintiff's residence]. *After this explosion occurred*, the sewage from the community sewerage system was redirected to 109 S. Shore Drive. The sewage was pumped or flowed into the on-site

3

tanks and ultimately over-filled the tanks at 109 S. Shore Drive. The sewage was pumped or flowed into the on-site tanks and ultimately overflowed the tanks and flowed into the lake and simultaneously entered the home at 109 S. Shore Drive...The water entering the home was not groundwater, but would properly be described as sewage.

*Id.* at 3. *See also* Doc. 35-2 at 2 (September 27, 2017 Oram Report, stating the same). The report then concluded:

Therefore, the source of the sewage water and cause of the damage was the mechanic explosion that ultimately occurred within the community sewage collection system and not related to any actions by Mrs. Sanko.

*Id.* at 4. According to Plaintiff's insurance policy with Defendant, the validity of which is undisputed, Defendant's coverage contains numerous exclusion provisions. The relevant provision in this case pertains to water damage (the "water damage clause"):

*We do not cover loss* to the property described in Coverage A—Dwelling Protection or Coverage B—Other Structures Protection consisting of or caused by:
1. Flood, including, but not limited to, surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.
2. Water or any other substance that backs up through sewers or drains.
3. Water or any other substance that overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure.
4. Water or any other substance on or below the surface of the ground, *regardless of its source.* This includes water or any other substance which exerts pressure on, or flows, seeps, or leaks through any part of the residence premises.

4

> We *do* cover sudden and accidental direct physical loss caused by fire, explosion or theft *resulting from* items 1 through 4 listed above.[2]

Doc. 33-9 (hereinafter "Insurance Ag.") at 28 (emphasis added).

Defendant argues that the water damage clause precludes coverage in light of the Third Circuit's opinion in *Colella v. State Farm Fire & Cas. Co.*, which held that a similar water damage exclusion clause applied to preclude the insured's claim. 407 F. App'x 616 (3d Cir. 2011). Plaintiff argues that *Colella* does not apply because "her damages were caused by a sudden and accidental explosion when the community sewage system produced a pressure that blew off her check valve and then permitted debris and effluent [i.e. sewage waste] from the community sewage system to explode into the lower level of her home." Doc. 34 at 5. Plaintiff argues that the last sentence of the water damage referencing loss "caused by fire, explosion or theft resulting from items 1 through 4 listed above" entitled her to coverage. *Id.* at 11. Defendant, in the reply brief, counters that the term "resulting from" means that the water damage "must precede and cause the 'explosion,'" while in this case, "Plaintiff's losses did not precede the 'explosion,' but rather followed it." Doc. 38 at 4.

---

[2] Plaintiff is claiming damages with respect to both damages to her dwelling and damages to tangible property inside her home. Doc. 1-1 ¶ 11. Two separate sections of the Policy are implicated here, Coverage A (Structure) and Coverage C (Personal Property). However, the two sections contain identical water damage clauses. Thus, the Court only reproduces the clause found in Coverage A here, though the water damage clause applies with equal force to Plaintiff's personal property damages.

5

## II. STANDARDS OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, …[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

6

most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

### III. ANALYSIS

According to Plaintiff's insurance policy, Defendant does not cover any losses "consisting of or caused by...water or any other substance on or below the surface of the ground, regardless of its source...includ[ing] water or any other substance which exerts pressure on, or flows, seeps, or leaks through any part of the residence premises." Insurance Ag. at 28. The Court sees no reason to deviate from the principles set forth in

7

*Colella*, which held that broad and unambiguous language in a substantively similar water damage exclusion clause barred coverage for the insured. The policy in *Colella* barred coverage for any losses caused by water "regardless of the cause." *Colella*, 407 F. App'x at 620-21. The Third Circuit found that there was "no way to interpret the words 'regardless of the cause' in a manner that provides coverage for the Colellas." *Id.* at 621. Because the policy unambiguously excluded "coverage for damage caused by water below the surface of the ground, regardless of the cause of the subsurface water," the Court held that it "must give effect to that language." *Id.* (internal citations omitted). Likewise, the relevant exclusion in this case is broadly worded—it denies coverage for losses caused by "water or any other substance on or below the surface of the ground, regardless of its source." These words plainly exclude all damages from water or other substance entering Plaintiff's home, regardless of the source of that substance.

Plaintiff does not deny that sewage waste entered her basement, but she maintains that her losses are in fact caused by an "explosion," which entitles her to coverage based on the carved out exception to the water damages clause. Doc. 34 at 5 (claiming "that all her damages were caused by a sudden and accidental explosion when the community sewage system produced a pressure that blew off her check valve and then permitted debris and effluent from the community sewage system to explode into the lower level of her home."). The exception states that notwithstanding the excluded events listed in the water damages clause, Defendant would "cover sudden and accidental direct physical loss caused by fire,

8

explosion or theft *resulting from* items 1 through 4 listed above." Insurance Ag. at 28 (emphasis added).

However, the mere fact that an explosion occurred does not automatically grant coverage under the water damage clause. Plaintiff contends that "a reasonable interpretation [of the exception] would be [if] I have a theft, then items 1 through 4 are covered, if I have an explosion, the[n] coverage is also provided." Doc. 34 at 24. *See also id.* at 38 (misquoting the policy and claiming that "the policy specifically says, we do not provide coverage for sump pump, water backup, flooding and pressure exertion but 'we do cover those incidents if there is a sudden and accidental direct physical loss caused by an explosion.'"). Plaintiff's argument is contrary to the plain language of the exception. The phrase "resulting from" denotes that the explosion *must follow* from "items 1 through 4 listed above," namely, (1) a "flood"; (2) "water or any other substance that backs up through sewers or drains"; (3) "water or any other substance that overflows from a sump pump..."; or (4) "water or any other substance on or below the surface of the ground, regardless of its source...." Insurance Ag. at 28. In other words, if the sewage waste in Plaintiff's home had subsequently caused an explosion, any "direct physical loss" due to that explosion may be covered by the policy. But here, Plaintiff is attempting to argue the inverse, that is, because an explosion caused water or other substance from the community sewage system to flow into her individual sewage system, which proceeded to flow into her home, she is entitled to coverage.

9

Plaintiff's brief is vague on the details surrounding the "explosion"—perhaps intentionally so. In certain parts of the brief, Plaintiff claims that the explosion "occurred at [her] home" or "exploded into her premises." Doc. 34 at 11, 30. Elsewhere, Plaintiff claims that the explosion is the result of a "sudden, violent buildup that released energy triggering her check valve to have heavy pressure forcing it to blow off which then shot debris, material, and effluent flying outwardly into her home and land." *Id.* at 23. Finally, in another portion of the brief, Plaintiff states that "all her damages were caused by a sudden and accidental explosion when the community sewage system produced a pressure that blew off her check valve and then permitted debris and effluent from the community sewage system to explode into the lower level of her home." *Id.* at 5. None of these statements are accompanied by citations to the record. The Court therefore conducted its own review of the record, the most relevant portions of which are reports from Plaintiff's expert, Brian Oram.

Mr. Oram's reports clearly establish a sequence of events in which the explosion *preceded* the sewage waste's entry into Plaintiff's home. In fact, the reports conclude that the explosion *caused* the sewage overflow in the first place. First, Oram noted that Plaintiff's losses derive exclusively from sewage water from outside flowing into her home:

> After entering your home, I discovered that the basement was flooded with approximately 4 to 6 Inches of sewage....There was no evidence of a break in the potable water lines in the home or that the home was the source of the contamination....Therefore, the source of the flowing sewage was from outside of the home.

10

Doc. 33-8 (June 19, 2016 Oram report) at 1. Oram then stated:

> It is my professional opinion that the source of the sewage water was the community sewage collection and distribution system. At the time of this incident, the existing community septic systems were malfunctioning and not working properly. Since Mr. Kidney [a plumber] confirms[] the check valve failed because it was 'blown off' the discharge piping, this observation demonstrates that this incident and related damage was caused by the community sewage system and not any activities or actions of Mrs. Sanko.

*Id.* at 2. Oram's later reports, dated September 27, 2017 and November 13, 2017, draw similar conclusions. They both state that Plaintiff's home and property damage was caused by "pressure built-up within the sewerage collection system for Section 9 and the sudden release of this pressure is the explosion that caused the 'Fernco' coupling to be blown-off the sewer piping for 109 S. Shore Drive [i.e. Plaintiff's address]. *After this explosion occurred,* the sewage from the community sewerage system was redirected to 109 S. Shore Drive." Doc. 35-2 at 1; *see also* 35-3 at 3 (same). The sewage was then "pumped or flowed into the on-site tanks and ultimately over-filled the tanks at 109 S. Shore Drive...and ultimately overflowed the tanks and flowed into the lake and simultaneously entered the home at 109 S. Shore Drive." *Id.*

Thus, Oram concluded that it is the explosion that caused the sewage water from the community sewage system to flow into Plaintiff's individual system's tanks, which then overflowed and seeped into her basement, causing damage to her home. These conclusions are consistent with Oram's deposition testimony, in which he testified:

> The only source of that water would be water from the [community] distribution system... water would then -- would be permitted to flow, back

11

flow from that distribution system into the dosing tank and then that water was then proceeded to go into the septic tank to the point where it over flowed the tank and then finally get to the point where it saturates the ground enough on the outside of the tank or along it to follow the chase and the pipe to go into [Plaintiff's] house.

Doc. 33-6 at 111. In addition to Oram's reports, Plaintiff also submitted a report from "Kitchens by Kidney, Inc.," without any explanation as to what the company did or what its relation was to Plaintiff or this case. Doc. 35-7. However, the one page report does state that someone named Hank Kidney visited Plaintiff's home after she "called our office and informed us that the basement was flooded at 109 S. Shore Dr.," and that

> [Mr. Kidney] went to above address and found that the finished basement was flooded with eight to ten inches of septic water. Upon further inspection outside, [Kidney] found that the check valve in the effluent tank was blown off the discharge pipe due to extreme pressure in the main septic line from street and other homes attached to that main septic line, their pumps were pushing the effluent and solids into Audry [sic] Sanko's septic system causing it to overflow *and then into her house*.

*Id.* (emphasis added). Finally, Plaintiff also offered the deposition testimony of Joby Poster, who worked for Semper Fi, a plumbing service company. Doc. 35-6. Poster testified that he found that a certain part of Plaintiff's individual system "blew apart," which caused the sewage waste of "everybody else, when their pumps turn on…to take the easiest path of resistance and all their shit is going to pump into her tank." *Id.* at 33. *See also id.* at 34 ("Like I said, when that blows off, all that stuff will blow into her tank. That's why it – it forces it up into here and into her house.").

12

Thus, as evidenced by Plaintiff's own reports and exhibits, the "explosion" of a check valve is what caused sewage waste from the community sewage system to flow into her individual tank, which *then* overflowed and leaked into her home. *See also* Doc. 34 at 5 (Plaintiff's brief averring that the explosion occurred "when the community sewage system produced a pressure that blew off her check valve *and then* permitted debris and effluent from the community sewage system to explode into the lower level of her home.") (emphasis added). Regardless of the location of the explosion, the fact that it *preceded* the overflow of sewage into Plaintiff's home, and indeed, *caused* that overflow, forecloses coverage under the water damage clause.[3]

In other words, Plaintiff's losses are directly caused by the sewage that flowed into her home. Whether or not that flow of sewage is caused by an earlier explosion is irrelevant, since the policy broadly prohibits coverage for losses caused by "water or any other substance...regardless of its source....includ[ing] water or any other substance which exerts pressure on, or flows, seeps, or leaks through any part of the residence premises." Insurance Ag. at 28. As shown by Plaintiff's own submissions, the purported "explosion" necessarily occurred prior to the overflow of sewage from the community system into her

---

[3] Notwithstanding the fact that the explosion must "result from" one of the events enumerated in the water damage clause, the Court notes its reservations on whether a check valve being "blown off" could be properly categorized as an "explosion." Plaintiff does not argue that any chemical, gaseous, or nuclear event precipitated the check valve's malfunctioning. Rather, it appears that the check valve malfunctioned due to extreme pressure from the community sewage system. *See, e.g.,* Docs. 35-2, 35-3. In any event, whether or not the check valve being "blown off" constitutes an "explosion" is not dispositive in this case, as the policy clearly indicates that for any loss from "explosion" to be covered, the explosion itself must result from water damage, not vice versa.

13

individual tank and subsequently into her basement. Furthermore, the same exception states that coverage will only be extended to "*direct* physical loss caused by fire, explosion, or theft...." Doc. 33-9 at 28. By the Plaintiff's own expert's account, her losses are not "directly" due to the explosion. Rather, the explosion set off a chain of events that caused sewage waste from the community sewage system to flow into Plaintiff's individual sewage tanks, which in turn overflowed and eventually leaked into Plaintiff's basement. Thus, the water damages clause's exception for "direct physical losses caused by fire, explosion, or theft resulting from" water damage does not apply to Plaintiff's claim.

In fact, the policy in *Colella* contained a near identical exception for "fire, explosion or theft." In that case, the clause stated that the insurance company will "insure for any direct loss by fire, explosion or theft resulting from water damage, provided the resulting loss is itself a Loss insured." *Colella*, 407 F. App'x at 618. As discussed above, the *Colella* Court, noting the expansive language of the water damage exclusion, precluded plaintiff from recovery. *Id.* at 621. Plaintiff attempts to distinguish her policy from that of *Colella* by pointing out that her policy did not contain the term "providing the resulting loss itself is insured" in the exception for fire, explosion, or theft. Doc. 34 at 39. This distinction is not relevant to the case. First, the facts of *Colella* did not involve any fires, explosions, or theft. Thus, the application of the exception was not in question, nor did the Court analyze that exception. Second, neither the addition nor omission of the phrase "provided the resulting loss is itself a Loss insured" would affect the clause as applied to Plaintiff's case.

14

Regardless of whether or not the "resulting loss" from the explosion "is itself a Loss insured," the fact remains that the explosion must still *result from*, not *bring about*, the water damage. In other words, the phrase "provided the resulting loss is itself a Loss insured" refers only to the fact that the damage caused by an explosion, if any, must *itself be independently insured* pursuant to the policy. The omission of the term has no bearing on the dispositive issue in this case, i.e. whether the explosion resulted from water damage, or vice versa. In this case, Plaintiff is precluded from recovering for damages caused by flow of sewage water into her home "regardless of its source," even if the source of that sewage water was initially caused by an explosion.

In addition to the attempt to distinguish *Colella*, Plaintiff cites three cases for the proposition that "[t]here was a sudden, accidental, explosive event that occurred at [her] home and therefore she does have coverage." Doc. 34 at 30 (citing *Livornese v. Med. Protective Co.*, 253 F. Supp. 2d 821 (E.D. Pa. 2003), *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.*, 657 A.2d 1252 (Pa. Super. Ct. 1995), and *Consolidation Coal Co., Inc. v. Liberty Mut. Ins. Co.*, 406 F. Supp. 1292 (W.D. Pa. 1976)). None of these cases dealt with homeowners' insurance policies, let alone analyzed any water damage exclusions. Instead, *Livornese* was a medical malpractice suit. *Consolidation Coal* was a case concerning workers compensation coverage. *State Farm* was a vehicle accident insurance case—and incidentally, also a case reversed by the Pennsylvania Supreme Court. *See State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.*, 701 A.2d

15

1330, 1334 (Pa. 1997). It appears that instead of finding cases applicable to the factual and legal issues at hand, Plaintiff cited these cases solely because the contracts in those cases were found to be ambiguous. However, mere findings of ambiguity in unrelated cases do not lend support to Plaintiff's argument, especially without accompanying legal analysis that compares the contractual language in those cases to that of Plaintiff's own policy.

Lastly, Plaintiff claims that in other exclusion clauses in her policy, the term "not otherwise excluded" appears, but that term does not appear in the water damage clause, thus rendering the clause ambiguous. Doc. 34 at 11. However, the mere omission of a term occurring elsewhere in a policy does not render an otherwise plain text ambiguous. In fact, the inclusion of such a term in the water damage clause would be superfluous and confusing. The clause clearly excludes all losses caused by "water or any other substance on or below the surface of the ground, regardless of its source." To introduce the term "not otherwise excluded" to modify such a broad exclusion would be superfluous given the all-encompassing term "regardless of its source."

In sum, because the "explosion" preceded and caused the sewage overflow that subsequently seeped into Plaintiff's basement, not vice versa, the exception to the water damages clause does not apply, and the expansive clause bars coverage for Plaintiff's claim. *Baker v. Metro. Prop. & Cas. Ins. Co.*, 2013 WL 5308196, at *3 (M.D. Pa. Sept. 19, 2013) ("questions of where the pipe burst originally occurred; whether it happened suddenly or through gradual wear and tear; or whether the source of the burst was itself above the

16

surface of the ground are all irrelevant. The water damage exclusion, buttressed by its expansive lead-in clause, is sufficient by itself to bar coverage under the facts alleged in Plaintiffs' Complaint").

In the alternative, Defendant argues dismissal is also appropriate because Plaintiff's losses are separately excluded under paragraph 20 of the policy, which excludes coverage for all "faulty, inadequate or defective" planning, design, and construction of the home. Insurance Ag. at 30. Defendant argues that Plaintiff's expert identified inadequate design and maintenance of the community sewage system as the source that caused the explosion, which in turn caused sewage to flow into her home. Doc. 33-2 at 14-17. Thus, Defendant argues that Plaintiff's losses are independently excluded under the "planning, design, and construction" exclusion. Plaintiff counters with paragraph 21 of the policy, which states that Defendant will not "cover loss to covered property…when (a) there are two or more causes of loss to the covered properly; and (b) the predominant cause(s) of loss is (are) excluded under Losses We Do Not Cover, items 1 through 20 above." Insurance Ag. at 30. Plaintiff argues that the "predominant cause of loss" in this case is the explosion, not faulty design or construction of the community system, and that explosions *are* covered under her interpretation of the water damage clause. Doc. 34 at 12-13.

However, even assuming that Plaintiff is correct that an explosion caused her damages instead of faulty construction or design of the community sewage system, it does not bypass the fact that, as discussed above, the mere fact that an explosion occurred does

17

not entitle her to coverage. As stated above, because the explosion preceded and caused the flow of sewage matter into her home, it does not fall under the exception in the water damage clause. Thus, the expansive lead-in language of the water damage clause, stating that Defendant does "not cover loss to the property...consisting of or caused by...water or any other substance on or below the surface of the ground, regardless of its source" must control, barring Plaintiffs from coverage. *See, e.g., Gillin v. Universal Underwriters Ins. Co.*, 2011 WL 780744, at *7 (E.D. Pa. Mar. 4, 2011) ("Under Pennsylvania law, language of a lead-in clause in an insurance policy stating that any loss caused by enumerated exclusions is excluded regardless of any cause or event and regardless [of] if [it came] from natural or external forces is unambiguous."); *T.H.E. Ins. Co. v. Charles Boyer Children's Tr.*, 455 F. Supp. 2d 284, 298 (M.D. Pa. 2006) ("there is no ambiguity in the policy at issue that would suggest that the exclusion for damage caused by surface water is ambiguous. The exclusion for surface water damage, coupled with the lead-in clause, unambiguously bars recovery here."), *aff'd*, 269 F. App'x 220 (3d Cir. 2008). The breach of contract claim for failure to pay insurance coverage to Plaintiff will be dismissed.

Finally, because Defendant had a reasonable basis to deny Plaintiff's claim for coverage, the bad faith claim will be dismissed. "Pennsylvania law provides a remedy when an insurer has acted in bad faith toward the insured." *Colella*, 407 F. App'x at 622 (citing 42 Pa. Cons. Stat. § 8371). "[T]o recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that

defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Id.* (quoting *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)). Therefore, where the insurance company had a reasonable basis for denying Plaintiff's claim, the bad faith claim necessarily fails. *See, e.g., USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 202 (3d Cir. 2006) ("[W]e will affirm the grant of summary judgment in favor of Liberty Mutual on this claim because USX's bad faith claim necessarily fails in light of our determination that Liberty Mutual correctly concluded that there was no potential coverage under the policy"); *White v. W. Am. Ins. Co.*, 2008 WL 5146555, at *15 (M.D. Pa. Dec. 8, 2008) ("Since there was no duty by Defendant to cover the damages to the Plaintiffs' house and personal property, there can be no bad faith claim"). The bad faith claim will be dismissed.

## IV. CONCLUSION

For the reasons outlined above, Defendant's supplemental motion for summary judgment (Doc. 33) will be granted. A separate Order will follow.

Robert D. Mariani
United States District Judge